IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| PATRICK D. CUMMINS,<br>PLAINTIFF,<br>V.<br>UNITED STATES DEPARTMENT OF DEFENSE;<br>UNITED STATES DEPARTMENT OF THE NAVY;<br>UNITED STATES MARINE CORPS; AND<br>UNITED STATES CENTRAL COMMAND,<br>DEFENDANTS. | CIVIL ACTION NO. 2:26-CV-1143 |

## COMPLAINT

Plaintiff Patrick D. Cummins, for his Complaint against Defendants, states as follows:

## I. NATURE OF THE ACTION

1. This is an action under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), to compel Defendants to conduct adequate searches for, and to produce, classified and unclassified records responsive to three related FOIA requests submitted by Plaintiff.

2. Each request seeks records bearing on whether United States military planning, messaging, or command communications concerning combat operations against Iran have been framed in terms of biblical prophecy, apocalyptic religious belief, or a divine mission.

3. As to the requests described in Counts I and II, Defendants failed to issue any determination within the twenty working days FOIA allows. As to the request described in Count III, the Navy closed the request three working days after receipt on the ground that it did not reasonably describe the records sought; Plaintiff appealed; on July 17, 2026 the Office of the Judge Advocate General granted the appeal, remanded the request, and directed the Navy to issue an updated final determination within twenty working days; Plaintiff narrowed the request as directed; and the Navy has issued no determination since.

4. As to each, Defendants never invoked unusual circumstances under 5 U.S.C. § 552(a)(6)(B), never extended the time to respond, never identified a responsive record, and never asserted an exemption.

5. Plaintiff has exhausted his administrative remedies as to each request. As to the requests described in Counts I and II, and as to the Navy's conduct following the appeal decision described above, Plaintiff is deemed to have exhausted under 5 U.S.C. § 552(a)(6)(C)(i). As to the Navy's determination of March 10, 2026, Plaintiff exhausted by administrative appeal, and the Office of the Judge Advocate General granted him relief.

6. The requested records have been improperly withheld within the meaning of 5 U.S.C. § 552(a)(4)(B).

## II. PARTIES

7. Plaintiff Patrick D. Cummins is a natural person, an attorney, and an engineer. He resides in Gahanna, Franklin County, Ohio, and practices as Dean Cummins Law Firm at 470 W Broad St. #22, Columbus, Ohio 43215.

8. Defendant United States Department of Defense is an agency of the United States within the meaning of 5 U.S.C. § 552(f)(1). The remaining Defendants are components of the Department of Defense. Each of the three requests described below was submitted to, received by, and is being processed by a component of the Department of Defense under the Department-wide Freedom of Information Act regulations promulgated at 32 C.F.R. Part 286, and the Office of the Secretary of Defense FOIA Liaison received a copy of the request described in Count II. Plaintiff names the Department of Defense because it is the agency of which each remaining Defendant is a part and because it is answerable for its components' compliance with the Freedom of Information Act.

9. Defendant United States Department of the Navy ("Navy") is an agency within the meaning of 5 U.S.C. § 552(f)(1).

10. The Navy has possession, custody, or control of records responsive to the requests described in Counts I and III.

11. The Navy maintains the FOIA office that received and docketed the request described in Count III.

12. Defendant United States Marine Corps ("Marines") is an armed service within the Department of the Navy. The Department of the Navy is a military department and

is therefore an agency within the meaning of 5 U.S.C. § 552(f)(1) and 5 U.S.C. § 551(1). Headquarters, United States Marine Corps administers its own Freedom of Information Act program, receives and adjudicates requests in its own name, and issued in its own name the determination and statement of appeal rights described below. Plaintiff names the Marines as the component that received, docketed, and has withheld the records described in Count I. To the extent the Marines are not separately an agency within the meaning of 5 U.S.C. § 552(f)(1), Count I lies against the Department of the Navy and the Department of Defense, of which the Marines are a part.

13. United States Marine Corps Headquarters maintains the FOIA office that received and docketed the request described in Count I.

14. Defendant United States Central Command ("CENTCOM") is a unified combatant command established under 10 U.S.C. § 161 and a component of the Department of Defense. CENTCOM administers its own Freedom of Information Act Requester Service Center, receives and adjudicates requests in its own name under 32 C.F.R. Part 286, and issued in its own name the determination and statement of appeal rights described below. Plaintiff names CENTCOM as the component that received, docketed, and has withheld the records described in Count II. To the extent CENTCOM is not separately an agency within the meaning of 5 U.S.C. § 552(f)(1), Count II lies against the Department of Defense, of which CENTCOM is a part.

15. CENTCOM maintains the FOIA Requester Service Center that received and docketed the request described in Count II.

## III. JURISDICTION, VENUE, AND JOINDER

16. This Court has subject-matter jurisdiction under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

17. Venue is proper in this District under 5 U.S.C. § 552(a)(4)(B), which provides for venue in the district in which the complainant resides, and under 28 U.S.C. § 1391(e)(1). Plaintiff resides in the Southern District of Ohio.

18. This action is properly filed at the Columbus location of Court. Under 28 U.S.C. § 115(b)(2), Franklin County lies within the Eastern Division of this District, and under S.D. Ohio Civ. R. 82.1(b), the area served by the Columbus location of Court includes Franklin County. Because no Defendant resides in this District, the allocation rule that governs is S.D. Ohio Civ. R. 82.1(e), which directs that the action be filed at the location of Court serving a county in which a substantial part of the events or omissions giving rise to the claim occurred. Plaintiff prepared and submitted each of the three requests from Franklin County; and each Defendant directed its correspondence to Plaintiff in Franklin County. A substantial part of the events and omissions giving rise to these claims accordingly occurred in Franklin County, which the Columbus location of Court serves.

19. Joinder of Defendants is proper under Fed. R. Civ. P. 20(a)(2).

20. Plaintiff's claims arise out of the same series of transactions and occurrences: parallel FOIA requests seeking materially similar categories of records, described by materially similar search terms, and concerning the same subject matter and similar military operations.

21. The claims present common questions of law and fact, including whether each component's interim correspondence constituted a determination under 5 U.S.C. § 552(a)(6)(A)(i), whether each conducted a search reasonably calculated to locate responsive records, and whether records concerning the same operations are exempt from disclosure.

22. Defendants have represented that processing of the request described in Count II will require consultation with other Department of Defense components.

## IV. FACTUAL ALLEGATIONS

### A. The Events Giving Rise to the Requests

23. On February 28, 2026, the United States, acting together with Israel, commenced military operations against Iran. The United States designated its operations Operation Epic Fury. The United States and Iran entered a ceasefire on April 8, 2026, and the Secretary of State declared Operation Epic Fury concluded in early May 2026. The ceasefire collapsed on July 8, 2026. Hostilities between the United States and Iran

resumed and have continued since, including United States strikes against Iranian targets in September 2026.[1]

24. Beginning that day, the Military Religious Freedom Foundation ("MRFF"), a nonprofit organization that represents service members in matters of religious liberty, began receiving complaints from service members alleging that commanders had characterized the operations against Iran as the fulfillment of Christian biblical prophecy.

25. Reporting published in the first days of March 2026 placed the number of such complaints at more than one hundred ten (110). By March 3, 2026, the organization reported receiving more than two hundred (200) complaints, from more than forty units and spanning more than fifty military installations, encompassing every branch of the armed forces.[2]

---

[1]Operation Epic Fury, U.S. Dep't of War, https://www.war.gov/Spotlights/Operation-Epic-Fury/ (last visited September 14, 2026); 2026 Iran War, Encyclopædia Britannica, https://www.britannica.com/event/2026-Iran-war (last visited September 14, 2026); Iran War Update: September 1–2, 2026, JINSA, https://jinsa.org/wp-content/uploads/2026/09/Iran-War-Update-9.2.26.pdf (last visited September 14, 2026).

[2]MRFF Inundated with Complaints of Commanders Telling Troops Iran War Is "Part of God's Divine Plan," Military Religious Freedom Found. (Mar. 3, 2026), https://www.militaryreligiousfreedom.org/2026/03/mrff-inundated-with-complaints-of-gleeful-commanders-telling-troops-iran-war-is-part-of-gods-divine-plan-to-usher-in-the-return-of-jesus-christ/; US Troops Told Iran War "Anointed by Jesus" to Bring on Armageddon, Watchdog Says, Middle East Eye (Mar. 4, 2026), https://www.middleeasteye.net/news/us-troops-told-iran-war-anointed-jesus-bring-armageddon-watchdog-says; Commanders Accused of Framing Iran War as Biblical Mandate, Military.com (Mar. 3, 2026), https://www.military.com/daily-news/2026/03/03/military-officers-accused-of-framing-

26. The most widely reported of those complaints was submitted by an active-duty non-commissioned officer, a self-identified Christian assigned to a unit outside the Iran combat zone but subject to deployment in support of the operations, writing on behalf of himself and fifteen other members of his unit, among them eleven Christians, one Jew, and one Muslim.

27. According to that complaint, a commander opened a combat readiness status briefing by urging those present to tell their troops that the operations in Iran were part of a god's divine plan, cited passages of the Christian Bible's Book of Revelation concerning Armageddon and the imminent return of the Christian god, Jesus Christ, and stated that President Trump had been "anointed by Jesus to light the signal fire in Iran," in order to bring about Armageddon and mark that return to Earth.[3]

28. The complaint was first reported by the independent journalist Jonathan Larsen and was subsequently reported by The Guardian, Military.com, Al Jazeera, Middle East Eye, TRT World, and numerous other domestic and international outlets.

29. On March 6, 2026, the co-chairs of the Congressional Freethought Caucus and the Ranking Member of the House Armed Services Subcommittee on Military Personnel, joined by twenty-seven of their colleagues, asked Platte B. Moring III, the Inspector General of the Department of Defense, to open an investigation into reports that officers

---

iran-war-biblical-mandate.html.

[3] Military Religious Freedom Found., supra note 2.

had invoked religious prophecy and apocalyptic theology to justify United States military action in Iran.[4]

30. That letter asked the Inspector General to determine, among other things: whether commanders or other officers told subordinates that operations against Iran are part of a religious prophecy, divine plan, or apocalyptic religious event, and where in the chain of command such communications originated; whether any such statements violated Department of Defense Instruction 1300.17 concerning religious neutrality, improper proselytizing, or abuse of command authority; the scope and geographic distribution of complaints received within the Department concerning religiously framed messaging about the Iran conflict; whether service members who reported such concerns experienced retaliation or feared it; what training, guidance, or oversight exists to ensure that commanders maintain religious neutrality in operational briefings, command communications, and other official settings; and whether additional guidance or action is warranted to ensure that personal religious beliefs are not used to justify or frame United States military operations.

31. The conduct described in the complaints, if it occurred, would implicate settled constitutional limits on government action. The Supreme Court has held that it is no

---

[4]Letter from Reps. Jared Huffman, Jamie Raskin, and Chrissy Houlahan et al. to the Hon. Platte B. Moring III, Inspector General, U.S. Dep't of Defense (Mar. 6, 2026), available at https://huffman.house.gov/imo/media/doc/letter_to_dod_ig_in_response_to_iran_war_comments.pdf (last visited September 14, 2026).

part of the business of government to compose or sponsor official prayers or religious exercises. *Engel v. Vitale*, 370 U.S. 421, 425 (1962). It has further held that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise. *Lee v. Weisman*, 505 U.S. 577, 587 (1992). The coercion with which those decisions are concerned is more acute in a military command than in the civilian settings they addressed: the audience for a commander's statements is a subordinate one, attendance at an operational briefing is a duty rather than a choice, and dissent carries professional consequence.

32. Plaintiff does not ask this Court to adjudicate whether any violation occurred. Plaintiff alleges that the allegations were made, that they concern the conduct of United States military commanders during ongoing combat operations, that they are the subject of a pending request for investigation by the Inspector General of the Department of Defense, and that the records sought would tend to confirm or refute them. The Freedom of Information Act exists to permit the public to make that assessment for itself.

33. Each of the three requests described below uses terms drawn from the complaints and reporting described in this section.

### B. Relevant Background

34. Pete Hegseth was sworn into office on January 25, 2025 as the Secretary of Defense, now styled the Secretary of War.

35. Prior to his appointment, in 2018, Secretary Hegseth spoke at the Arutz Sheva conference at the King David Hotel in Jerusalem.[5]

36. Video of the speech is widely available and shows Secretary Hegseth stating the following:

> "Jennifer and I and others had a chance to go see the Western Wall of the Temple Mount, the Western Wall tunnels, so much of the Old City. And as you stand there, you can't help but behold the miracle before you. And it got me thinking about another miracle that I hope all of you don't see too far away — because 1917 was a miracle, 1948 was a miracle, 1967 was a miracle. 2017, the declaration of Jerusalem as the capital, was a miracle. And there's no reason why the miracle of the reestablishment of the temple on the Temple Mount is not possible. I don't know how it would happen. You don't know how it would happen. But I know that it could happen. That's all I know. And a step in that process — a step in every process — is the recognition that facts and activities on the ground truly matter. And that's why going and visiting Judea and Samaria, understanding that sovereignty — the very sovereignty of Israeli soil, Israeli cities, locations — is a critical next step to showing the world that this is the land for Jews and the land of Israel. And I believe, as was mentioned, he said you need to buy the ticket. Don't just wish for 40 years to win the lottery. Buy the ticket. I would submit to you, in light of the support you have in Washington, DC — the support you have amongst patriotic Americans, amongst evangelical Christians, amongst believers, amongst Republicans, even amongst some Democrats who can barely say it anymore in Washington — buy the ticket, take your action, do what needs to be done here in Israel, because I truly believe this is a moment where America will have your back."

---

[5] Trump's Nominee for Secretary of Defense Once Suggested a Temple Could Be Built on Temple Mount, JNS (Nov. 14, 2024), https://www.jns.org/trumps-nominee-for-secretary-of-defense-once-suggested-a-temple-could-be-built-on-temple-mount/; Next US Defense Secretary Pete Hegseth Called for New Jewish Temple at Al-Aqsa, Middle East Eye (Nov. 14, 2024), https://www.middleeasteye.net/news/new-us-defence-secretary-called-building-third-temple-jerusalem.

37. Secretary Hegseth's reference to "1967" refers to the Six-Day War, during which Israel captured East Jerusalem, including the Temple Mount, as well as the West Bank and Gaza.

38. Secretary Hegseth's reference to "2017" refers to the United State's 2017 recognition of Jerusalem as Israel's capital.

39. Secretary Hegseth's reference to "reestablishment of the temple on the Temple Mount" refers to a temple at a site destroyed by Rome in 70 C.E.

40. The reestablishment to which Secretary Hegseth referred would require either displacing the Al-Aqsa Mosque and the Dome of the Rock, which stand on the Temple Mount today in the Old City of Jerusalem.

41. In apocalyptic Christian theology, the reestablishment of a temple on the Temple Mount is a precondition to the return of the Christian god, Jesus Christ. The remarks quoted above are pleaded because they are evidence that the framework within which the complaints described in Section IV.A are expressed is one that has been articulated publicly by the official who now heads the Department of Defense.

42. Plaintiff does not allege that Secretary Hegseth made, directed, approved, or was aware of any of the statements described in Section IV.A. Plaintiff pleads the foregoing solely as background bearing on the public interest in the records sought.

### C. The Marines Request

43. On July 17, 2026, Plaintiff submitted a FOIA request ("Marines Request") to Headquarters, United States Marine Corps through the SecureRelease portal. The Marines Request was received the same day and assigned Case No. 2026-USMCFOIA-005313. A true and correct copy is attached as Exhibit A.

44. The Marines Request seeks records generated by or shared with combatant commanders and their staffs, operational planning cells, intelligence directorate personnel (J2), chaplains assigned to deploying units, public affairs officers, unit commanding officers, executive officers, battalion and brigade chaplains, equal opportunity advisors, inspector general personnel, and command climate and human relations staff, containing specified phrases concerning biblical prophecy, apocalyptic theology, or a divine mission, in the context of United States military combat operations, operational readiness, force deployments, or strategic planning with respect to Iran, for the period January 1, 2024 through the date of receipt.

45. Headquarters, United States Marine Corps placed the Marines Request on its "Simple" processing track.

46. Plaintiff did not request a fee waiver as to the Marines Request. Defendants have not requested advance payment, provided a fee estimate, or asserted that any fee issue impedes processing.

47. On July 24, 2026, Michael L. Peters, Deputy, FOIA/PA Programs, Headquarters, United States Marine Corps, sent Plaintiff an electronic mail message acknowledging

receipt and denying Plaintiff's request for expedited processing. A true and correct copy is attached as Exhibit B.

48. The July 24, 2026 message identified no responsive record, did not state whether Defendants would comply with the Marines Request, asserted no exemption, and produced no record. It addressed only expedited processing and administrative appeal rights.

49. The July 24, 2026 message advised Plaintiff that when FOIA requesters have not received a determination within the twenty-day statutory period, they may challenge the delay on appeal.

50. The twenty-working-day period prescribed by 5 U.S.C. § 552(a)(6)(A)(i) began on July 20, 2026, the first working day after receipt, and expired on August 14, 2026.

51. Defendants' own records reflect that the Marines Request remains at the "Initial Determination" stage, with expedited processing shown as "Declined."

52. A true and correct copy of the requests list in Plaintiff's SecureRelease requester account, reflecting that status and the status of each other matter described in this Complaint, is attached as Exhibit M.

### D. The CENTCOM Request

53. On July 17, 2026, Plaintiff transmitted a FOIA request ("CENTCOM Request") by electronic mail to the United States Central Command FOIA Requester Service Center, with a copy to the Office of the Secretary of Defense FOIA Liaison. CENTCOM received

the CENTCOM Request on July 20, 2026 and assigned it Case No. 26-0257. A true and correct copy of the CENTCOM Request and the ensuing correspondence is attached as Exhibit C.

54. The CENTCOM Request seeks records created or received on or after January 1, 2025 through the date the search is conducted, in any format, including electronic mail, memoranda, message traffic, briefing slides, talking points, orders, and reports.

55. The CENTCOM Request seeks three categories of records: (a) records within CENTCOM's operational and administrative record categories — including plans, operation orders, fragmentary orders, significant activity reports, operational investigations, command messaging and command-information products, and public affairs guidance — that concern operations, force deployments, or strategic planning with respect to Iran and contain the specified search terms; (b) correspondence, electronic mail, and staff products generated by, received by, or approved by the Command Group, the Directorate of Intelligence (J2), the Directorate of Operations (J3), the Directorate of Strategy, Plans, and Policy (J5), the Command Chaplain, and the Directorate of Public Affairs, containing those terms in the context of operations concerning Iran; and (c) materials produced by CENTCOM's subordinate service-component, functional, and task-force commands in support of operations concerning Iran that CENTCOM retains as part of its Joint and operational records.

56. The specified search terms include "return of Jesus Christ," "the return of Christ," "Second Coming," "biblical prophecy," "end times," "apocalypse," "Armageddon," "to cause Armageddon," "God's divine plan," "divine mission," "God's will," "anointed by Jesus," "anointed" in connection with a commander or with Iran, "light the signal fire in Iran," "mark his return to Earth," and "Revelation" in connection with Iran or an operational briefing.

57. The CENTCOM Request further asked that all reasonably segregable non-exempt portions of any withheld record be released, that each redaction cite the specific exemption claimed, and that Plaintiff be provided the volume of information withheld as required by the closing provisions of 5 U.S.C. § 552(b). The CENTCOM Request further invoked 5 U.S.C. § 552(a)(8), which requires an agency to consider whether partial disclosure is possible and to take reasonable steps to segregate and release non-exempt information. The CENTCOM Request stated Plaintiff's willingness to work with CENTCOM to refine its scope or to prioritize particular record categories, and asked that CENTCOM contact Plaintiff before closing or narrowing the CENTCOM Request on scope grounds.

58. By letter dated July 21, 2026, digitally signed July 22, 2026, and transmitted to Plaintiff on July 23, 2026 as an attachment to the message described below, Marilyn Siu, CW4, Chief of the Freedom of Information Act, Privacy Act, and Mandatory Declassification Review Branch, acknowledged receipt of the CENTCOM Request,

denied expedited processing, and granted Plaintiff's request for a fee waiver. A true and correct copy is attached as Exhibit D.

59. CENTCOM's grant of the fee waiver reflects a determination that disclosure of the requested records is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government, and is not primarily in Plaintiff's commercial interest, within the meaning of 5 U.S.C. § 552(a)(4)(A)(iii).

60. The July 21, 2026 letter identified no responsive record, did not state whether CENTCOM would comply with the CENTCOM Request, asserted no exemption, and produced no record. It stated that the CENTCOM Request was then number 1,389 in CENTCOM's queue and that processing time would depend upon consultation with other Department of Defense components, stateside, overseas, or other agencies.

61. The July 21, 2026 letter described the CENTCOM Request as seeking records through July 20, 2026. The CENTCOM Request as submitted seeks records through the date the search is conducted.

62. Plaintiff has never agreed to limit the CENTCOM Request to records created on or before July 20, 2026.

63. On July 22, 2026, CENTCOM sent Plaintiff an electronic mail message stating that it needed to clarify some aspects of the information sought and asking Plaintiff to contact its office. That message did not ask Plaintiff to narrow the CENTCOM Request,

did not identify any respect in which the CENTCOM Request failed to describe the records sought, and did not state that the CENTCOM Request would be closed or limited if Plaintiff did not respond.

64. On July 23, 2026, Plaintiff conferred with CENTCOM by telephone, and confirmed in writing the same day that the CENTCOM Request encompasses both classified and unclassified holdings. Plaintiff also identified public reporting that provides context for the CENTCOM Request, and expressly asked that CENTCOM not narrow the pending request on the basis of that message.

65. On July 23, 2026, CENTCOM replied that it would provide Plaintiff's clarification to its action officers for reference during the search process, and transmitted the July 21, 2026 letter as its acknowledgment of the CENTCOM Request.

66. CENTCOM has at no time stated that it declines to search classified holdings, asserted any exemption under 5 U.S.C. § 552(b)(1) or Executive Order 13526, or given Plaintiff a Glomar or other categorical response.

67. The twenty-working-day period prescribed by 5 U.S.C. § 552(a)(6)(A)(i) began on July 21, 2026, the first working day after receipt, and expired on August 17, 2026. Even if CENTCOM's July 22, 2026 message is treated as a request for information tolling that period under 5 U.S.C. § 552(a)(6)(A)(ii)(I), the tolling ended upon Plaintiff's response on July 23, 2026, and the period expired no later than August 18, 2026.

68. CENTCOM has not represented that it is making reasonable progress in reducing its backlog of pending requests.

**E. The Navy Request**

69. On March 5, 2026, Plaintiff submitted a FOIA request ("Navy Request") to the Department of the Navy through the national FOIA portal at FOIA.gov. The portal assigned the submission Confirmation ID 2780801 and routed the Navy Request to the Department of the Navy, Chief of Naval Operations, DNS-36.

70. The Navy received the Navy Request and assigned it Case No. 2026-NavyFOIA-005452. A true and correct copy of the Navy Request as submitted is attached as Exhibit E.

71. The Navy Request seeks records containing specified phrases concerning biblical prophecy, apocalyptic theology, and divine mission, in the context of United States military combat operations, operational readiness, force deployments, or strategic planning with respect to Iran, generated by or shared with combatant commanders and their staffs, operational planning cells, intelligence directorate personnel, chaplains assigned to deploying units, public affairs officers, unit commanding officers, executive officers, battalion and brigade chaplains, equal opportunity advisors, inspector general personnel, and command climate and human relations staff. The search terms and custodian categories are materially identical to those of the Marines Request.

72. As originally submitted, the Navy Request specified a date range of January 1, 2024 through the date of receipt. Because the Navy received the Navy Request on March 5, 2026, the Navy Request as originally submitted reached records created on or before that date. Plaintiff subsequently narrowed that period as described below.

73. The Navy Request asked for a waiver of all fees under 5 U.S.C. § 552(a)(4)(A)(iii) and stated the grounds for that waiver. The Navy has never granted or denied that request. The Navy's letter of March 10, 2026, described below, states only that fees are not applicable to a request the Navy was closing. Since the Office of the Judge Advocate General set that letter aside and the Navy resumed processing, the Navy has issued no ruling upon the fee waiver request and has given Plaintiff no notice of any. The Navy's own record for Case No. 2026-NavyFOIA-005452 shows the fee waiver as "Pending Decision." A true and correct copy of that record is attached as Exhibit K.

74. The Navy Request also asked for expedited processing under 5 U.S.C. § 552(a)(6)(E) and stated the grounds for that request. Under 5 U.S.C. § 552(a)(6)(E)(ii)(I), the Navy was required to determine whether to grant expedited processing within ten days after the date of the request, that is, by March 15, 2026. The Navy has never made that determination and has never notified Plaintiff of any determination upon it, more than six months after it received the Navy Request. The Navy's own record for Case No. 2026-NavyFOIA-005452 shows expedited processing as "Pending Decision," as does its

record for each of Case Nos. 2026-NavyFOIA-010102 and 2026-NavyFOIA-010103, which seek the same records on the same stated grounds.

75. On March 10, 2026, three working days after receipt, the Navy issued a letter captioned as its final response to the Navy Request. The letter states that the Navy Request does not comply with 32 C.F.R. § 701.8(a)(1) because it does not sufficiently describe the records sought, and that Plaintiff's file has been closed. It invites Plaintiff to submit a new request, states appeal and dispute-resolution rights, and states that fees are not applicable. It does not identify any responsive record, state that any search was conducted, or assert any exemption. The letter is addressed to Plaintiff at 348 E Main St., Lexington, Kentucky, which is not Plaintiff's residence or place of business. The Navy's letters of July 17, 2026 and July 22, 2026 bear the same address. The requester record the Navy maintains for Case No. 2026-NavyFOIA-005452 lists Plaintiff's address as 470 W Broad St. #22, Columbus, Ohio 43215. A true and correct copy of that record is attached as Exhibit L. The letter was signed for R. Strong, Director, Navy FOIA/PA Program Office, and was transmitted by electronic mail. A true and correct copy is attached as Exhibit F.

76. The March 10, 2026 letter does not address Plaintiff's request for expedited processing. The Navy has never determined whether to grant expedited processing in Case No. 2026-NavyFOIA-005452, and the period prescribed by 5 U.S.C. § 552(a)(6)(E)(ii)(I) expired on March 15, 2026.

77. In quoting the Navy Request, the March 10, 2026 letter reproduces the list of search terms and stops there. It omits the remainder of the request, which identifies the categories of custodians whose records were to be searched, identifies the government communications systems to be searched, and specifies a date range of January 1, 2024 through the date of receipt. The letter states that requesters must supply reasonable limits such as a time frame, the offices to search, and the details of the subject matter. The Navy Request as submitted, and as reproduced in full in Exhibit E, supplied a date range, categories of custodians, and a statement of subject matter. The letter does not acknowledge those portions of the request or explain why they are insufficient.

78. On March 10, 2026, the same day the Navy issued that letter, Plaintiff administratively appealed it to the Judge Advocate General (Code 14) under 32 C.F.R. § 701.12(a). The Navy assigned the appeal Case No. 2026-NavyAPPEAL-000225. The appeal asked the appellate authority to reverse the closure and order a search, and asked in the alternative that the Navy be directed to communicate with Plaintiff to refine the scope of the request, including the negotiation of a time frame and the identification of appropriate offices.

79. The Navy has acknowledged that case number in writing twice: in its letter of July 22, 2026, which recites that the review it was undertaking was the result of appeal 2026-NAVYAPPEAL-000225, and in its electronic mail of August 18, 2026, which directs Plaintiff to use the tracking serial number "2026-NavyFOIA-005452 // 2026-

NavyAppeal-000225" in all communications. The appeal does not appear in the Navy's SecureRelease portal, which the Navy brought online after the appeal was filed. The appeal decision described below recites that the appeal was received on March 10, 2026, states the tracking number assigned to it, and summarizes the grounds Plaintiff raised.

80. By letter dated July 17, 2026, the Office of the Judge Advocate General granted the appeal. The appellate authority found that, although the Navy Request was broad, the initial denial authority "should have made an attempt to narrow and perfect" the request before denying it, and that the applicable regulation, 32 C.F.R. § 286.5, requires a component to notify a requester that a request does not reasonably describe the records sought and to inform the requester why the request is insufficient or what further information is needed to process it.

81. The appellate authority granted the appeal, remanded the matter to the initial denial authority for further action, and directed Plaintiff to work with that authority to identify the types of records sought and, as to email, the positions or names of the custodians to be searched. Plaintiff thereby exhausted his administrative remedies as to the March 10, 2026 determination, and that determination no longer stands. A true and correct copy of the appeal decision is attached as Exhibit H.

82. Under 5 U.S.C. § 552(a)(6)(A)(ii), the appellate authority was required to determine the appeal within twenty working days, a period that expired on April 7, 2026. The appellate authority did not decide the appeal until July 17, 2026, ninety

working days after it received the appeal. Its letter was copied to the Department of the Navy Chief Information Officer, to the Chief of Naval Operations, and to DNS-36, the office processing the Navy Request. The letter of July 17, 2026 directed the initial denial authority to conduct a secondary review of the Navy Request and to issue an updated final determination within twenty working days of the date of that letter, that is, by August 14, 2026. It further directed that, if the initial denial authority could not complete its review within that period, it was to provide Plaintiff a status update or a rolling release of documents as of that date, and to make subsequent releases or updates every fifteen working days thereafter.

83. The Navy issued no updated final determination by August 14, 2026. It provided no status update and no rolling release as of that date, and it has made no subsequent release or update, whether on September 4, 2026 or at any other time. Following the remand the Navy resumed processing Case No. 2026-NavyFOIA-005452. The Navy has not reinstated the closure announced in the March 10, 2026 letter, has not closed the case again, and has not contended since July 22, 2026 that the Navy Request fails to describe the records sought. The Navy's own portal reflects the case as open, bearing a due date of August 21, 2026 and no closed date, and the Navy confirmed on August 18, 2026 that the case remains under review.

84. By letter dated July 22, 2026, R. Strong, Director, Navy FOIA/PA Program Office, advised Plaintiff that the Navy Request did not sufficiently describe the records sought

within the meaning of 32 C.F.R. § 701.8(a)(1) and requested clarification. The letter asked Plaintiff to supply a narrow time frame, the offices to be searched, specific subject-matter detail, the positions or names of individual custodians, and a narrow list of keywords. The letter stated that email archives can be searched only by individual custodian rather than by office or component. The Navy directed Plaintiff to respond within ten working days and stated that if no response were received by August 7, 2026, the case would be closed. A true and correct copy is attached as Exhibit I.

85. On July 23, 2026, within the period the Navy prescribed, Plaintiff responded in full. A true and correct copy of the resulting electronic mail thread is attached as Exhibit J.

86. Plaintiff's July 23, 2026 response narrowed the Navy Request in each respect the Navy and the Office of the Judge Advocate General had identified. Plaintiff narrowed the time frame from January 1, 2024 to January 1, 2025 through the date the search is conducted, and further proposed processing in two tranches so that the period in which the underlying allegations arose could be released first. Plaintiff replaced the original keyword list with a narrowed list of twelve terms, and specified which of those terms could be conjoined with "Iran." Plaintiff identified seven email custodians by position, naming the individual incumbents where known. Plaintiff identified five offices for the search of non-email records. Plaintiff specified five record categories and stated the subject matter with particularity.

87. Plaintiff's response stated that the clarification superseded the keyword list in the original Navy Request. The operative Navy Request accordingly seeks records created or received on or after January 1, 2025 through the date the search is conducted, as described in that response.

88. Plaintiff's response further asked that responsive records be produced on a rolling basis, that segregable non-exempt portions be released with each exemption cited, that the Navy confirm the status of the pending request for expedited processing, and that the Navy contact Plaintiff to discuss any perceived insufficiency rather than close the case. Plaintiff stated his continued availability to confer.

89. The Navy has never advised Plaintiff that the operative Navy Request is insufficient to permit a search, and has never identified any record system that cannot be searched as described.

90. Any tolling of the twenty-working-day period under 5 U.S.C. § 552(a)(6)(A)(ii)(I) occasioned by the July 22, 2026 letter ended upon the Navy's receipt of Plaintiff's response on July 23, 2026.

91. On August 17, 2026, Plaintiff asked the Navy for a status update. On August 18, 2026, the Navy replied that its team was in the process of conducting a review, and directed Plaintiff to reference both Case No. 2026-NavyFOIA-005452 and Case No. 2026-NavyAPPEAL-000225 in further communications. The reply identified no responsive

record, stated no determination, asserted no exemption, and gave no date by which a determination would issue.

92. On July 17, 2026, Plaintiff submitted two further FOIA requests to the Department of the Navy, which the Navy assigned Case Nos. 2026-NavyFOIA-010102 and 2026-NavyFOIA-010103. The Navy's records for those two cases reflect a submitted date of July 17, 2026, a request status of "Closed (Duplicate Request)," and an expedited processing status of "Pending Decision," and each request specifies a date range of January 1, 2024 through the date of receipt of that request. By letters dated July 22, 2026, the Navy advised Plaintiff that it had previously received an identical request processed under Case No. 2026-NavyFOIA-005452 and that the July 17, 2026 requests were being closed as duplicates of that case. The Navy's portal reflects a closed date of July 23, 2026 for both.

93. The July 17, 2026 requests were not duplicates of Case No. 2026-NavyFOIA-005452 when the Navy closed them. Each request defines its temporal scope by reference to its own date of receipt. As Case No. 2026-NavyFOIA-005452 stood on July 22, 2026 — the Navy did not ask Plaintiff to clarify it until that day, and Plaintiff did not respond until the following day — that case reached records created on or before March 5, 2026, while the July 17, 2026 requests reached records created through July 17, 2026. On the date the Navy closed them, the later requests therefore sought approximately four and one-half months of records that Case No. 2026-

NavyFOIA-005452 could not then capture however it was processed. Plaintiff's clarification of July 23, 2026 extended the temporal reach of Case No. 2026-NavyFOIA-005452 through the date the search in that case is conducted, as described in Paragraph 87. That clarification postdates the closures and does not make them correct when made, and the Navy has neither reopened the July 17, 2026 requests nor represented that its search in Case No. 2026-NavyFOIA-005452 will reach the period those requests covered.

94. On August 17, 2026, Plaintiff submitted an administrative appeal of the duplicate closure to the Judge Advocate General (Code 14), which the Navy assigned Case No. 2026-NavyAPPEAL-000497. That appeal remains pending and undecided. Plaintiff pleads Paragraphs 92 through 94 as background bearing on the adequacy of the Navy's search in Case No. 2026-NavyFOIA-005452 and on the temporal scope of the records the Navy must search. Plaintiff does not assert in this action an independent claim arising from the closure of Case Nos. 2026-NavyFOIA-010102 and 2026-NavyFOIA-010103, and reserves that claim pending the Navy's decision on Case No. 2026-NavyAPPEAL-000497. A true and correct copy of the Navy portal record reflecting the status of each of the foregoing matters is attached as Exhibit M.

95. The Navy assigned Case No. 2026-NavyFOIA-005452 a due date of August 21, 2026. That date passed without any determination. The Navy's portal reflects no closed date for that request, and the Navy has confirmed that the request remains under

review. The Navy's own record for that case shows a request status of "Searching for Records." The Navy is therefore searching, and has been since at least the date of that record, without having issued the determination that 5 U.S.C. § 552(a)(6)(A)(i) and the direction of July 17, 2026 both required.

96. As of the filing of this Complaint, the Navy has not issued a determination as to Case No. 2026-NavyFOIA-005452, reported the results of any search, identified any responsive record, produced any record, or asserted any exemption.

### F. Facts Common to All Three Requests

97. Each request was docketed, assigned a case number, and made the subject of written correspondence. As to the Navy Request, the Navy contended on July 22, 2026 that the Navy Request as originally submitted did not reasonably describe the records sought; Plaintiff narrowed the Navy Request the following day in each respect the Navy identified, and the Navy has not since contended that the narrowed request is deficient. No Defendant has contended that the Marines Request or the CENTCOM Request fails to describe the records sought reasonably.

98. No Defendant has notified Plaintiff of unusual circumstances under 5 U.S.C. § 552(a)(6)(B), given Plaintiff written notice of the reasons for any extension and the date on which a determination would issue, or extended the time to respond.

99. Plaintiff conferred with CENTCOM by telephone and in writing on July 23, 2026, and narrowed the Navy Request on July 23, 2026 at the Navy's request and within the

period the Navy prescribed. No Defendant has asked Plaintiff to narrow the Marines Request or the CENTCOM Request. CENTCOM asked Plaintiff on July 22, 2026 to clarify aspects of the information sought, and Plaintiff conferred with CENTCOM and clarified the request the following day

100. CENTCOM did not ask Plaintiff to reduce the scope of the CENTCOM Request, and Plaintiff did not do so.

101. No Defendant has proposed an alternative time period for processing as to any request, or advised Plaintiff that any narrowed or clarified request remains insufficient.

102. Plaintiff also sought the assistance of the Navy FOIA Public Liaison. On March 10, 2026, within hours of receiving the letter described above, Plaintiff asked the Public Liaison for assistance and identified the respects in which that letter did not describe the request Plaintiff had submitted, including that the request used none of the three phrases the letter criticized and that it expressly limited the time frame.

103. The Public Liaison asked Plaintiff for a copy of the letter on March 16, 2026, received it the same day, and replied that he was making inquiries and would keep Plaintiff apprised. Plaintiff asked the Public Liaison for an update on August 17, 2026 and again on September 4, 2026.

104. As of the filing of this Complaint, the Public Liaison has reported no result of those inquiries and the Navy has issued no determination. A true and correct copy of that correspondence is attached as Exhibit G.

105. As of the filing of this Complaint, no Defendant has reported the results of any search, identified any responsive record, produced any record, or withheld any record under any claimed exemption.

106. No Defendant has issued a determination as to the requests described in Counts I and II. The only determination the Navy has issued as to the request described in Count III is the letter of March 10, 2026, which the Office of the Judge Advocate General set aside and which the Navy has not reinstated.

107. Because Defendants failed to comply with the time limits set forth in 5 U.S.C. § 552(a)(6)(A)(i) and failed to invoke the extension available under 5 U.S.C. § 552(a)(6)(B), Plaintiff is deemed to have exhausted his administrative remedies as to the requests described in Counts I and II under 5 U.S.C. § 552(a)(6)(C)(i). As to the request described in Count III, Plaintiff exhausted the March 10, 2026 determination by administrative appeal and prevailed on that appeal, and is deemed to have exhausted as to the Navy's conduct since that appeal was decided.

### G. The Search Terms and Their Significance

108. The search terms set out above appear across all three requests. Each is a term of art in apocalyptic or end-times Christian and Muslim theology, or a phrase attributed to military personnel in the reporting described in Section IV.A. Plaintiff pleads their scriptural sources and significance so that the Court and Defendants may understand

why records containing these particular terms bear on the integrity of military decision-making.[6]

109. "Return of Jesus Christ," "the return of Christ," and "Second Coming." These terms refer to the doctrine stated at certain Christian Bible sections, Acts 1:11 and Matthew 24:30, and developed at 1 Thessalonians 4:16–17, that the Christian god will come to Earth. Records using these terms in connection with combat operations would indicate that military action is being understood as an instrument for hastening a theological event rather than as a means to a lawful strategic objective. Whether a nation goes to war to accomplish an end of state policy or to accomplish an end of prophecy is a question of the first importance to the public.

110. "Mark his return to Earth." This phrase corresponds to the return described at Revelation 19:11–16 and at Zechariah 14:4. Its use in an operational context would indicate that a military act is being framed as an event that signifies or commemorates that return, which is a religious purpose and not a military one.

111. "Biblical prophecy." Christians often treat the Christian Bible as having some amount of prophecy that is divinely originated from their god rather than a matter of private interpretation. A commander who characterizes an operation as the fulfillment

[6] All Christian Bible citations in this section are to the Authorized (King James) Version of the Christian Bible, which is in the public domain in the United States. The wording of each passage cited is fixed and may be verified in any edition of that version. Plaintiff's Request for Judicial Notice, filed herewith, identifies every passage cited in this section. Electronic sources are supplied in the footnotes below for the three passages whose language is quoted or closely paraphrased in the text.

of prophecy asserts that the operation is not subject to ordinary strategic revision, because a prophesied outcome cannot be reconsidered on the merits. That framing is inconsistent with civilian control of the military.

112. “End times.” The phrase corresponds to the “last days” of discussed in the Christian Bible at sections 2 Timothy 3:1 and Acts 2:17, and to the sealed prophecy of Daniel 12:4. Records describing operations against Iran as occurring in or inaugurating the end times would indicate a belief that ordinary consequences (e.g., escalation, retaliation, civilian casualties, the survival of populations) are subordinate to a foreordained sequence. The public has a substantial interest in knowing whether such a belief informs decisions about the use of force.

113. “Apocalypse.” The word derives from the Greek apokalypsis, the opening word of the Christian Bible section Revelation 1:1, meaning an unveiling or revelation. In common usage it denotes catastrophic destruction of life. Its appearance in operational records, particularly in conjunction with “Iran” and “operations,” would bear directly on whether catastrophic outcomes are being treated as costs to be avoided or as ends to be sought.

114. “Armageddon” and “to cause Armageddon.” The Christian Bible section Revelation 16:14 describes the gathering of the kings of the earth to the battle of that great day, and Revelation 16:16 names the place of that gathering as Armageddon. The distinction between the two terms is material. To invoke Armageddon is to use a

familiar metaphor for catastrophe. To speak of causing Armageddon is to describe an intention to bring about a final and global conflict. Records containing the latter formulation would evidence a purpose to endanger humanity at large, which no lawful military objective can encompass and which bears on whether force is being employed for the common defense.[7]

115. "Revelation." The Christian Bible's Book "Revelation" is the scriptural source of the Armageddon narrative and of the end-times sequence generally. Plaintiff has limited this term to records in which it appears in connection with Iran or with an operational briefing, so that the request reaches the use of that text as a framework for military planning rather than incidental or devotional references.

116. "God's divine plan," "divine mission," and "God's will." These correspond to the doctrine of divine purpose stated at the Christian Bible section Ephesians 1:11 and Isaiah 46:10. A commander who describes an operation as the will of God asserts a justification that cannot be tested, debated, or countermanded by any civilian authority. Records employing these terms would bear on whether operations against Iran are being justified to subordinates on grounds that displace the chain of command and the constitutional allocation of war powers.

---

[7] Revelation 16:16 (King James Version), available at https://biblehub.com/kjv/revelation/16-16.htm (last visited September 11, 2026); see also https://www.kingjamesbibleonline.org/Revelation-16-16/ (last visited September 11, 2026).

117. "Anointed by Jesus" and "anointed." Anointing marks divine selection, as at the Christian Bible section 1 Samuel 16:13, where Samuel anoints David. The Christian Bible section Isaiah 45:1 applies the term to Cyrus, king of Persia, a passage of particular significance in a request concerning Iran and one invoked in contemporary political discourse. To describe a President or a commander as anointed is to assert that his decisions carry divine sanction, which is irreconcilable with the Establishment Clause and with the principle that military and civilian officers are accountable to law rather than to claimed revelation. Plaintiff has limited the standalone term to records in which it appears with "commander" or with "Iran."

118. "Light the signal fire in Iran." This phrase is not an exact quotation of the Christian Bible. Signal fires and beacons appear at the Christian Bible sections Jeremiah 6:1 and Judges 20:38 as instruments for summoning a people to war. The phrase is included because the reporting described in Section IV.A attributes it, verbatim, to a commander who is said to have told a unit that President Trump had been anointed to light a signal fire in Iran in order to bring about Armageddon. Records containing this phrase would confirm or refute that specific allegation.

119. "Exodus 21" and "Exodus 21:7." The Christian bible at Exodus 21 sets out rules governing servitude, and Exodus 21:7 provides that a daughter sold as a maidservant does not go free as menservants do. The circulation of this passage within a command structure bears on the religious-liberty rights of service members under Department of

Defense Instruction 1300.17, on equal opportunity obligations under Department of Defense Instruction 1350.02, and on good order and discipline, because a text governing the sale of women or daughters has no lawful application to the duties of military personnel.[8]

120. "When a man sells his daughter." This term searches for the language of the Christian bible's Exodus 21:7 rather than its citation. A record may quote or paraphrase the verse in a briefing, an address to assembled personnel, or correspondence without naming chapter and verse, and a search confined to the citation would not reach it. Plaintiff includes the phrase so that the request captures the passage as it would actually appear in speech reduced to writing. The significance of the passage is that it is a rule for the sale of a human being, and specifically of a child; its appearance in records concerning military operations would bear on whether scriptural texts inconsistent with the equal dignity of service members are being transmitted through official channels.[9]

121. "Ephesians 6:5." This Christian bible verse directs servants to obey their masters with fear and trembling. It was among the passages most frequently invoked in defense of chattel slavery in the United States. Within a military command structure, the verse can be deployed to demand unquestioning obedience as a religious duty, which is inconsistent with the obligation of every service member to refuse a manifestly

---

[8]Exodus 21:7 (King James Version), available at https://www.christianity.com/bible/kjv/exodus/21-7 (last visited September 11, 2026).
[9]Exodus 21:7 (King James Version), supra note 8.

unlawful order. Records containing this citation would bear on whether obedience is being framed to subordinates in scriptural rather than lawful terms.[10]

122. The terms described in the three preceding paragraphs 119 through 121 — "Exodus 21," "Exodus 21:7," "when a man sells his daughter," and "Ephesians 6:5" — appear in the Marines Request and the CENTCOM Request. The CENTCOM Request listed these four terms as optional additional terms, and CENTCOM's July 21, 2026 letter recited each of them as part of the request it had received and was processing. Plaintiff confirms that all four terms are included in both the Marines Request and the CENTCOM Request.

123. The statement of grounds for expedited processing submitted with the Navy Request identifies as a subject of public concern the potential circulation of biblical texts endorsing slavery within the command structure.

124. "Divine plan," "signal fire," and "Book of Revelation." In the clarification Plaintiff furnished to the Navy on July 23, 2026, these three terms appear in standalone form rather than in the longer formulations used in the requests as originally submitted. The standalone forms are broader and were adopted at the Navy's request in order to reduce the total number of search terms while preserving coverage. "Divine plan" reaches records that attribute an operation to providence without naming a god expressly. "Signal fire" reaches records repeating the phrase attributed to a commander

[10] Ephesians 6:5 (King James Version), available at https://www.christianity.com/bible/kjv/ephesians/6-5 (last visited September 11, 2026).

without the words “light the” or “in Iran,” which a paraphrase or a summary of the remark would likely omit. “Book of Revelation” reaches records citing the text by its full title. Plaintiff pleads these variants so that no responsive record is excluded by a difference in phrasing. That same clarification removed from the Navy Request the terms “apocalypse,” “god’s will,” “anointed by Jesus,” “light the signal fire in Iran,” “mark his return to Earth,” “Revelation,” and “to cause Armageddon.” Each of those terms remains within the scope of the Marines Request and the CENTCOM Request, and Plaintiff pleads the significance of each in Paragraphs 110 and 113 through 118 because each remains in issue as to those two requests.

125. Several terms are searched only in conjunction with a second word, and the limiters are themselves significant. “Iran” confines the search to the operations at issue and excludes devotional, chaplaincy, and personal religious material that has no bearing on this action. “Military” and “operations” confine general eschatological vocabulary to records concerning the use of force rather than commentary. “Strike” confines “god’s will” to records in which providence is invoked in connection with a specific kinetic action, which is the point at which a theological claim becomes an operational one. “Briefing” confines “Revelation” to records in which the text appears in the course of operational planning or command information rather than in a religious service. “Commander” confines “anointed” to records in which the claim of divine

selection is made about a person exercising military authority. Plaintiff adopted these limiters to narrow the requests, not to narrow the public interest they serve.

126. Each of the foregoing terms was chosen because it may appear in a record only if the author had adopted the theological framework the term belongs to. Plaintiff does not allege that the presence of any term alone establishes unlawful conduct. Plaintiff alleges that whether such classified or unclassified records exist, and in what volume and at what level of command, is a matter the public is entitled to know while operations against Iran are ongoing.

127. Plaintiff requests that the Court take judicial notice under Federal Rule of Evidence 201(b)(2) of the wording of each Christian bible passage cited in this section, as that wording appears in the Authorized (King James) Version. The wording of those passages is not subject to reasonable dispute and can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Plaintiff requests notice of what the passages say, and not of the truth of what they assert, of any theological interpretation of them, or of any religious proposition. Plaintiff's separate Request for Judicial Notice, filed herewith, identifies each passage.

## V. CLAIMS FOR RELIEF

### COUNT I — VIOLATION OF THE FREEDOM OF INFORMATION ACT, 5 U.S.C. § 552

AS TO UNITED STATES DEPARTMENT OF DEFENSE, DEPARTMENT OF THE NAVY, AND UNITED STATES MARINE CORPS

128. Plaintiff incorporates each preceding paragraph as though fully restated.

129. The records sought by the Marines Request, described in Paragraphs 43 through 52, are agency records within the meaning of 5 U.S.C. § 552 and are in the possession, custody, or control of the Department of Defense, the Department of the Navy, and the United States Marine Corps.

130. Plaintiff has a statutory right to the release of those records under 5 U.S.C. § 552(a)(3)(A), and no exemption under 5 U.S.C. § 552(b) has been asserted as to any of them.

131. These Defendants have failed to conduct a search reasonably calculated to locate responsive records, failed to produce any responsive record, and failed to justify the withholding of any record. They have therefore improperly withheld agency records from Plaintiff within the meaning of 5 U.S.C. § 552(a)(4)(B).

## COUNT II — VIOLATION OF THE FREEDOM OF INFORMATION ACT, 5 U.S.C. § 552 AS TO UNITED STATES DEPARTMENT OF DEFENSE AND UNITED STATES CENTRAL COMMAND

132. Plaintiff incorporates each preceding paragraph as though fully restated.

133. The records sought by the CENTCOM Request, described in Paragraphs 53 through 68, are agency records within the meaning of 5 U.S.C. § 552 and are in the

possession, custody, or control of the Department of Defense and United States Central Command.

134. Plaintiff has a statutory right to the release of those records under 5 U.S.C. § 552(a)(3)(A), and no exemption under 5 U.S.C. § 552(b) has been asserted as to any of them.

135. CENTCOM has failed to conduct a search reasonably calculated to locate responsive records, failed to produce any responsive record, and failed to justify the withholding of any record. It has therefore improperly withheld agency records from Plaintiff within the meaning of 5 U.S.C. § 552(a)(4)(B).

## COUNT III — VIOLATION OF THE FREEDOM OF INFORMATION ACT, 5 U.S.C. § 552 AS TO UNITED STATES DEPARTMENT OF DEFENSE AND DEPARTMENT OF THE NAVY

136. Plaintiff incorporates each preceding paragraph as though fully restated.

137. The records sought by the Navy Request, described in Paragraphs 69 through 91 and 95 through 96, are agency records within the meaning of 5 U.S.C. § 552 and are in the possession, custody, or control of the Department of Defense and the Department of the Navy.

138. Plaintiff has a statutory right to the release of those records under 5 U.S.C. § 552(a)(3)(A), and no exemption under 5 U.S.C. § 552(b) has been asserted as to any of them.

139. The Navy closed the Navy Request on March 10, 2026 without conducting any search, on the ground that the request did not reasonably describe the records sought. Plaintiff appealed. By letter dated July 17, 2026 the Office of the Judge Advocate General granted the appeal, found that the Navy should have attempted to narrow and perfect the request before denying it, and remanded the matter. Plaintiff exhausted his administrative remedies as to that determination, and it no longer stands. The appellate authority directed the Navy to issue an updated final determination within twenty working days of July 17, 2026, and directed that if the Navy could not do so it provide a status update or rolling release as of that date and further updates every fifteen working days. The Navy issued no determination by August 14, 2026, provided no status update or rolling release, and has provided no update since. Plaintiff furnished the clarification the Navy requested on July 23, 2026, within the period the Navy prescribed, and any tolling under 5 U.S.C. § 552(a)(6)(A)(ii)(I) ended on that date. Twenty working days thereafter expired on August 20, 2026, and the due date of August 21, 2026 that the Navy assigned to the Navy Request itself also passed. The Navy has issued no determination since. The Navy separately failed to determine Plaintiff's request for expedited processing within the period prescribed by 5 U.S.C. § 552(a)(6)(E)(ii)(I), which expired on March 15, 2026, and has not determined it since; failed to rule upon Plaintiff's request for a fee waiver; and did not confirm the status of the expedited-processing request when Plaintiff asked on July 23, 2026.

140. The Navy has failed to conduct a search reasonably calculated to locate responsive records, failed to produce any responsive record, and failed to justify the withholding of any record. It has therefore improperly withheld agency records from Plaintiff within the meaning of 5 U.S.C. § 552(a)(4)(B).

141. Plaintiff has no adequate remedy at law as to any Count.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Declare that Defendants failed to determine Plaintiff's requests within the period prescribed by 5 U.S.C. § 552(a)(6)(A)(i) and that Plaintiff is therefore deemed to have exhausted his administrative remedies under 5 U.S.C. § 552(a)(6)(C)(i);

B. Declare that Defendants have improperly withheld agency records from Plaintiff;

C. Declare that the Navy Request, as clarified on July 23, 2026, reasonably describes the records sought within the meaning of 5 U.S.C. § 552(a)(3)(A) and 32 C.F.R. § 701.8(a)(1), and order Defendants to conduct searches reasonably calculated to locate all records responsive to Plaintiff's requests, including, as to the CENTCOM Request, a search of classified as

well as unclassified holdings and of records created after July 20, 2026 through the date the search is conducted;

D. Order Defendants to produce all responsive, non-exempt records (classified or unclassified), and all reasonably segregable non-exempt portions of any records withheld, on a rolling basis and according to a schedule fixed by the Court;

E. Order the Department of the Navy to comply with the direction of the Office of the Judge Advocate General of July 17, 2026 and to rule forthwith upon Plaintiff's requests for expedited processing and for a fee waiver in Case No. 2026-NavyFOIA-005452, or, if the Court concludes that the request for expedited processing no longer presents a live controversy, order the Navy to rule upon the fee waiver request and to process that case on a schedule fixed by the Court;

F. Order Defendants to provide an index justifying any withholding under 5 U.S.C. § 552(b);

G. Enjoin Defendants from continuing to withhold any responsive, non-exempt record;

H. Retain jurisdiction to ensure compliance;

I. Award Plaintiff the litigation costs reasonably incurred in this action under 5 U.S.C. § 552(a)(4)(E), together with such attorney fees, if any, as may be allowable under that provision; and

J. Grant such other relief as the Court deems just and proper.

Dated: September 15, 2026

Respectfully submitted,

/s/ Patrick D. Cummins
Patrick D. Cummins (Ohio Bar No. 0105801)
DEAN CUMMINS LAW FIRM
470 W Broad St. #22
Columbus, Ohio 43215
Telephone: (502) 445-9880
Patrick@CumminsIP.com

Plaintiff, pro se